U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED - SHREVEPORT

AUG 31 2015

TONY R. MOORE, CLERK
BY_____
                DEPUTY

### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF LOUISIANA
### LAKE CHARLES DIVISION

| | | |
|---|---|---|
| **ENERGY COAL, S.p.A.** | : | **NO. 2:14-CV-03092** |
| **VERSUS** | : | **JUDGE WALTER** |
| **CITGO PETROLEUM CORP.** | : | **MAGISTRATE JUDGE KAY** |

### MEMORANDUM RULING

Before the court is a motion to dismiss [Doc. #18] filed on behalf of defendant CITGO Petroleum Corporation. Plaintiff Energy Coal, S.p.A. opposes the motion. [Doc. #34]. For the following reasons, the motion to dismiss [Doc. #18] is **GRANTED.**

### I. BACKGROUND

This case involves a dispute between two international oil companies. The plaintiff, Energy Coal, S.p.A., ("Energy Coal"), an Italian company based in the city of Genoa, has a "principal business is buying and selling fuel grade petroleum coke, a product derived from oil-refining coker units, and it also operates terminals and services terminal facilities." [Doc. #1-2, p. 3, ¶ 1]. In 2011, Energy Coal entered into a number of contracts with PDVSA Petróleo, S.A. ("Petroleo"). *Id.* at 7, ¶ 22. Petroleo is a wholly-owned subsidiary of Petróleos de Venezuela, S.A. ("PDVSA"), the state-owned oil company of the Bolivarian Republic of Venezuela. *Id.* at 1–2, ¶¶ 3–4. Petroleo and PDVSA were both formed under Venezuelan law, and both are based in the city of Caracas. *Id.*

The contracts between Energy Coal and Petroleo provided that Energy Coal would perform certain work and services in Venezuela. Specifically, these "Service Contracts" consisted of:

(A) two contracts "for the refurbishment of PDVSA's facilities in the petrochemical complex of Jose located in the State of Anzoategui, Venezuela ('Inbound and Outbound Refurbishment Contracts')";

(B) "a contract for Hugo Chavez's Gran Mision Vivienda Venezuela which involves the construction of housing for PDVSA in Colinas de San Francisco de Yare ('Housing Development Contract')";

(C) "a contract for the trucking of petcoke within PDVSA's facilities in the petrochemical complex of Jose ('Product Movement Contract')";

(D) "a contract for the construction and operation of a floating cargo terminal and improvements to the existing facilities in the petrochemical complex of Jose ('Floating Crane Contract')"; and

(E) "a spot contract for the purchase and sale of petcoke ('Spot Contract')."

*Id.* at 7, ¶ 22 (contract designations in original). The Service Contracts were accompanied by separate "Commercial Contracts" by which the parties set the rate, method, and terms by which Energy Coal would be compensated for its work. *Id.* at 8–13, ¶¶ 24–42.

Energy Coal claims that Petroleo failed to comply with its contractual obligations, and therefore, on September 12, 2014, Energy Coal filed this breach-of-contract suit in the 14th Judicial District Court in and for Calcasieu Parish, Louisiana, seeking over $186 million in damages. *Id.* at 13–14, 41, ¶¶ 43, 128. Despite the fact that the suit is exclusively concerned with Petroleo's actions, Petroleo is *not* named as a defendant. Rather, the only named defendant is CITGO Petroleum Corporation ("CITGO"), a Delaware Corporation with its principal place of business in Texas. *Id.* at 1, ¶ 2. Like its sister company Petroleo, CITGO is also a wholly-owned subsidiary of PDVSA. According to Energy Coal, CITGO's relationship with PDVSA and Petroleo allows CITGO to be sued for Petroleo's actions under Louisiana's Single Business Enterprise ("SBE") doctrine.[1] In

---

[1] The Louisiana Supreme Court has described the SBE doctrine as "a theory for imposing liability where two or more business entities act as one." *Brown v. ANA Ins. Grp.*, 2007-C-2116, p. 2, n. 2 (La. 2008);

-2-

support of this assertion, Energy Coal argues that "CITGO is a member of a group of multinational corporations, consisting of parent and subsidiary entities, which have integrated their resources to achieve a common business purpose and thus form a single business enterprise engaged in the exploration, production, refining, transportation and sale of petroleum products throughout the world." [Doc. #1-2, p. 2, ¶ 6]. Energy Coal then argues that, because these companies are a single business enterprise, "liability incurred by any member of the single business enterprise is attributed to all of its members so that CITGO is solidary [*sic*] liable along with the other members for the debts of PDVSA and/or Petroleo and/or Petroanzoategui[2] to Energy Coal." *Id.* Energy Coal also claims that venue is proper in Louisiana, and the imposition of the SBE doctrine is warranted, because CITGO operates a refinery in Lake Charles, Louisiana. *Id.* at 6, ¶¶ 19, 20.

CITGO removed the matter to this court based on diversity jurisdiction, and now moves to dismiss. [Doc. #18].[3] CITGO presents three bases for dismissal. First, CITGO argues that the matter should be dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure, because CITGO was not a party to the contracts at issue and was not involved in their performance, and there is no plausible argument by which CITGO may be sued for Petroleo's alleged breach of those contracts.

---

994 So. 2d 1265, 1266. "Generally, under the doctrine, when corporations integrate their resources in operations to achieve a common business purpose, each business may be held liable for wrongful acts done in pursuit of that purpose." *Id.* (citing *Green v. Champion Ins. Co.*, 577 So. 2d 249 (La. App. 1 Cir. 1991); *Brown v. Auto. Cas. Ins. Co.*, 93-2169 (La. App. 1 Cir. 1994); 644 So. 2d 723).

[2] According to the complaint, "Petroanzoategui C.A. and Petrocedeño were and still are Venezuelan entities that owned refineries or upgraders as well as terminal facilities in the Jose complex." [Doc. #1-2, p. 2, ¶ 4].

[3] Diversity jurisdiction is proper under 28 U.S.C. § 1332(a)(2), because the amount in controversy is well over $75,000.00, and the suit is between a citizen of a foreign country and a citizen of one of the United States. [Doc. #1]. For diversity purposes, Energy Coal is a citizen of Italy (the country where it is incorporated and where its headquarters are located) and CITGO is a citizen of Delaware (the state where it is incorporated) and Texas (the state where its headquarters are located). *See* 28 U.S.C. § 1332(c)(1).

[Doc. #18-1, pp. 19–29]. Alternatively, CITGO asserts that dismissal is warranted under Rule

12(b)(7), because Petroleo is an indispensable party under Rule 19 whose joinder is not feasible.[4]

*Id.* at 6–19. Finally, CITGO argues that dismissal is appropriate under Rule 12(b)(1) for lack of

ripeness, because Petroleo's liability must first be established before attempting to impute that

liability to CITGO. *Id.* at 5–6.

Energy Coal argues that Louisiana law applies to its SBE claims and, as such, Louisiana's

solidary-liability principles apply to this dispute. [Doc. #34]. Stated succinctly, Energy Coal takes

the position that CITGO's status as a solidary obligor defeats all of CITGO's arguments in favor of

dismissal because: (a) CITGO may be held liable for Petroleo's actions even though CITGO was not

directly involved with the underlying contracts; and (b) CITGO may be sued in Petroleo's place, and

therefore Petroleo does not need to be joined in the action or have its liability determined prior to

suit being brought against CITGO. *Id.* at 1–33, 43–60.

## II. LAW AND ANALYSIS

### A. Choice of Law

Because this case implicates the law of several different jurisdictions, the court must first

determine the correct law to apply.[5] A federal court sitting in diversity applies the law of the forum

---

[4] Specifically, CITGO argues that joinder of Petroleo is not feasible because: (a) Petroleo is not subject to personal jurisdiction in Louisiana; and (b) Petroleo, as an instrumentality of a nationally-owned oil company, is immune from suit under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602–1611. [Doc. #18-1, pp. 6–19].

[5] Energy Coal suggests that it is premature to determine the governing law at this stage, and that discovery will be necessary in order to furnish the court with the facts needed to make a final determination. [Doc. #34, pp. 33–34, 54–55]. The court rejects this argument. In some cases, courts have declined to make a choice-of-law determination when deciding a motion to dismiss, reasoning that further briefing and factual development would be necessary in order to properly address the relevant considerations. *See, e.g.*, *Haynesville Shale Rentals, LLC v. Total Equipment and Service, Inc.*, No.12-0860, 2012 WL 4867603, at *1, n. 4. (S.D. Tex. Oct. 12, 2012). Here, by contrast, the issue is fully briefed and no further factual

-4-

state in resolving conflict-of-laws issues. *Marchesani v. Pellerin-Milnor Corp.*, 269 F.3d 481, 485

(5th Cir. 2001) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938); *Klaxon Co. v. Stentor Elec. Mfg.*

*Co.*, 313 U.S. 487 (1941); *Allison v. ITE Imperial Corp.*, 928 F.2d 137, 128 (5th Cir. 1991)).

Accordingly, the court will apply Louisiana's conflict-of-laws provisions set forth in book IV of the

Louisiana Civil Code. *See* La. Civ. Code arts. 3515–3556.

      As a preliminary matter, the court notes that Venezuelan law plainly applies to the merits of

Energy Coal's breach-of-contract arguments themselves. Each of the contracts at issue includes a

provision stating that disputes arising thereunder will ultimately be decided by the Venezuelan courts

pursuant to Venezuelan law.[6] Louisiana Civil Code article 3540 states that, except for issues of form

and capacity, a choice-of-law provision will, in most circumstances, conclusively determine the law

to be applied to a contractual dispute. La. Civ. Code art. 3540; *see also NorAm Drilling Co. v. E &*

*PCO Int'l, LLC*, 48-591, p. 6 (La. App. 2 Cir. 2013); 131 So. 3d 926, 929 (citing *Mobil Exploration*

*& Prod. U.S. v. Certain Underwriters Subscribing to Cover Note 95-3317(A)*, 2001-2219 (La. App.

1 Cir. 2002); 837 So. 2d 11, 42–43). The one circumstance in which the parties' choice will not be

given effect is when the chosen jurisdiction's law "contravenes the public policy of the state whose

law would otherwise be applicable under Article 3537," *i.e.* the state whose law would be applicable

---

development is necessary. Energy Coal's petition and motion papers exhaustively detail the parties'
relationships with the candidate states and the dispute. [Doc. #1-2, pp. 8-9; Doc. #34, pp. 34–43]. CITGO
does not dispute the accuracy of Energy Coal's factual assertions, and instead only disputes that those facts
establish that Louisiana law governs. [Doc. #42, pp. 3–7]. Accordingly, the court finds that there are no
unknown facts which could alter the conflict-of-laws analysis. In such a situation, it is entirely appropriate
to make a determination of the governing law when deciding a motion to dismiss. *See In re BP P.L.C.
Securities Litigation*, No. 4:12-cv-1837, 2013 WL 5520067, at *8 (S.D. Tex. Sept. 30, 2013).

    [6] [Doc. #43, pp. 7, 21, 37, 53, 63 (English translations of the relevant portions of the Inbound
Refurbishment, Outbound Refurbishment, Housing Development, Product Movement, and Floating Crane
contracts); pp. 11, 26, 40, 58, 66 (the same provisions in the original Spanish); pp. 71, 75 (relevant portions
of the Spot Contract in the original English)].

had there been no choice-of-law provision. La. Civ. Code art. 3540, cmt. (f). Here, there is nothing to suggest that the law of any jurisdiction besides Venezuela would apply in the absence of the choice-of-law provision, much less that the public policy of another jurisdiction would be contravened if Venezuelan law applied. Accordingly, the issue of whether Petroleo breached its contracts with Energy Coal is governed by Venezuelan law.

However, the inquiry does not end there. Even assuming that Petroleo acted as alleged in the complaint, the court must still decide whether it is legally proper for Energy Coal to sue CITGO for Petroleo's actions. That question involves the distinct issue of when a court may depart from the general rule that a corporation has a separate legal identity from that of its shareholders and corporate affiliates.[7] CITGO argues that, because it is incorporated in Delaware, then Delaware law should apply to any attempt to disregard its corporate form. [Doc. #18-1, pp. 23–25]. Energy Coal claims that Louisiana's SBE doctrine applies because Louisiana has a more significant connection to this dispute than Delaware does. [Doc. #34, pp. 34–43].

There is no specific codal provision discussing how a court is to determine the applicable law regarding an SBE claim or any other corporate veil-piercing theory. *Global Oil Tools, Inc. v. Barnhill*, Civil Action Nos. 12:1507, 12-3041, 2013 WL 3070838, at *11 (E.D. La. June 17, 2013). Accordingly, the default rules of article 3515 apply. *Id.* Article 3515 provides that:

> Except as otherwise provided in this Book, an issue in a case having contacts with

---

[7] *See, e.g., Dole Food Co. v. Patrickson*, 538 U.S. 468, 474–75 (2003) (citations omitted) ("A basic tenet of American corporate law is that the corporation and its shareholders are distinct entities."); *Bujol v. Entergy Serv., Inc.*, 2003-0492, 2003-0502, p. 13 (La. 2004); 922 So. 2d 1113, 1127 (citations omitted) ("The law has long been clear that a corporation is a legal entity distinct from its shareholders and the shareholders of a corporation . . . shall not be personally liable for any debt or liability of the corporation. The same principle applies where one corporation wholly owns another."), *aff'd on reh'g*, 2003-0492, (La. 2004); 922 So. 2d 1113, 1144–48 (per curiam).

other states is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.

That state is determined by evaluating the strength and pertinence of the relevant policies of all involved states in the light of: (1) the relationship of each state to the parties and the dispute; and (2) the policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state.

For the following reasons, the court finds that article 3515 dictates that Delaware law applies in this case.

### *1. The Relationship of Each State to the Parties and the Dispute*

The first step in an article 3515 analysis is to evaluate the strength and pertinence of the relevant policies of the involved states in light of the relationship of each state to the parties and the dispute. Delaware, the state of CITGO's incorporation, clearly has a compelling policy interest in an attempt to sue a Delaware corporation for the acts of its corporate affiliate. "Delaware courts take the corporate form and corporate formalities very seriously . . . ." *Case Fin., Inc. v. Alden*, Civil Action No. 1184-VCP, 2009 WL 2581873, at *4 (Del. Ch. Aug. 21, 2009). "Delaware law respects corporate formalities, absent a basis for veil-piercing, recognizing that the wealth-generating potential of corporate and other limited liability entities would be stymied if it did otherwise." *Alliance Data Sys. Corp. v. Blackstone Capital Partners V, L.P.*, 963 A.2d 746, 769 (Del. Ch. 2009), *aff'd*, 976 A.2d 170 (Del. 2009). In other words, "Delaware public policy does not lightly disregard the separate legal existence of corporations." *BASF Corp. v. POSM II Properties P'ship, L.P.*, C.A. No. 3608–VCS, 2009 WL 522721, at *8 n. 50 (Del. Ch. Dec. 9, 2008) (citing *Gasden v. Home Pres. Co., Inc.*, Civ.A. 18888, 2004 WL 485468, at *4 (Del. Ch. Feb. 20, 2004)). These policies would be circumvented if Energy Coal successfully used Louisiana law to find that a Delaware corporation is not a separate entity from its corporate parent and affiliates. As such, Delaware has a strong policy

-7-

interest in the outcome of this dispute.

By contrast, Louisiana's interest is attenuated at best. According to Energy Coal, Louisiana's SBE doctrine is applicable because CITGO operates a major refinery in Lake Charles, and thus Louisiana "can be considered a center for enterprise activities in the United States." [Doc. #34, p. 39]. Therefore, Energy Coal asserts that Louisiana has an interest in applying its SBE doctrine to an enterprise member. This argument is not compelling. All parties agree, and the Louisiana Secretary of State's Commercial Records confirm, that CITGO's headquarters are in Houston, Texas. [Doc. #42-1, p. 3].[8] Thus, the court rejects Energy Coal's characterization of Louisiana as the "center for enterprise activities in the United States," because it is beyond dispute that CITGO directs its operations from its headquarters in Houston, not Lake Charles. It is obvious that Energy Coal merely seeks to characterize Louisiana as the "center for enterprise activities" because Louisiana law is more favorable to its cause than Texas law, which explicitly rejects the SBE doctrine. *See SSP Partners v. Gladstrong Investments (USA) Corp.*, 275 S.W.3d 444, 447 (Tex. 2008) (holding that "corporations cannot be held liable for each other's obligations merely because they are part of a single business enterprise.")

Next, Energy Coal asserts that Louisiana has "sound policy reasons" for applying the SBE doctrine because CITGO, in connection with its Lake Charles refinery, receives state, parish, and local services, and employs a large number of Louisiana residents [Doc. #34, p. 37]. While it is undoubtedly true that CITGO receives these services and is a major employer in southwest Louisiana, these facts in no way suggest that Louisiana should adopt a policy of allowing foreign

---

[8] Because the Louisiana Secretary of State's Commercial Records are matters of public record, the court may, and does, take judicial notice of the information contained therein. *See, e.g., Fornea v. Int'l Paper Co.*, Civil Action No. 14-1691, 2015 WL 729708, at *1 (E.D. La. Feb. 19, 2015).

plaintiffs to sue CITGO in Louisiana for the acts of its foreign affiliates, especially when those acts have no connection with Louisiana and occurred thousands of miles away. Here, unlike other cases in which Louisiana was found to have a significant connection to dispute, there is no claim that the defendant's activities in Louisiana caused damage within this state, and thus there is no need to apply Louisiana law. *Cf. Arabie v. CITGO Petroleum Corp.*, 89 So. 3d 307, 318–319 (La. 2012) (finding that Texas and Oklahoma had little connection to the parties or the dispute despite allegations that damage-causing corporate decisions occurred in those states, because suit concerned an oil spill at CITGO's Lake Charles refinery). Similarly, the court does not accept Energy Coal's argument that its own considerable business activities in Louisiana give Louisiana a policy interest in protecting Energy Coal. [Doc. #34, p. 38]. The fact that Energy Coal does business in this state does not mean that Louisiana should provide a forum for Energy Coal to resolve disputes that are unrelated to its business here.

Energy Coal does attempt to link Louisiana to the contracts at issue with a rather tortured argument that CITGO's Lake Charles refinery "benefitted" as a result Energy Coal's work in Venezuela. Energy Coal points to the fact that some of the crude oil shipped from the Jose Petrochemical complex in Venezuela is ultimately refined at CITGO's Lake Charles plant. *Id.* at 38–40. Thus, Energy Coal claims that CITGO "benefitted" from Energy Coal's refurbishment of the solids handling terminal used to load ships at the Jose complex, because if the solids handling terminal was not functional, then the shipment of crude oil to all destinations, including Lake Charles, would be negatively impacted. *Id.* This argument cannot serve to link Louisiana to the dispute. The court remains unconvinced that Louisiana has any policy interest in contracts between an Italian company and a Venezuelan company, by which work and services were to be performed

entirely within Venezuela.

## 2. The Policies and Needs of the Interstate and International Systems

The second area of inquiry of article 3515, *i.e.* "the policies and needs of the interstate and international systems," also counsels against applying Louisiana law. The article directs the court to specifically examine, "the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state." *Id.* Courts should also take into account such universally recognized goals as discouraging forum-shopping and encouraging uniformity of result. *Id.* cmt. (b)

Under these facts, CITGO could not have expected to be sued under Louisiana law for the overseas actions of its foreign affiliates. In arguing that CITGO should have expected to be sued here for the actions of PDVSA and its subsidiaries, Energy Coal argues that "PDVSA knew or should have known since 1991 (the year *Green*[9] was decided) that Louisiana has a single business enterprise doctrine rendering enterprise members solidarily liable for all enterprise obligations." [Doc. #34, p. 40]. Thus, Energy Coal suggests that "[b]y continuing to operate that enterprise business in Louisiana through CITGO's activities in this state, the enterprise members knowingly subjected CITGO (and CITGO knowingly subjected itself) to solidary liability under Louisiana's SBE doctrine." *Id.* Energy Coal fails to cite, and this court is unable to locate, a single case in which SBE doctrine has been used to sue a non-Louisiana corporation for the acts of its foreign parents and affiliates, when those actions were unrelated to the defendants activities in Louisiana and caused no damage in Louisiana. Having found no legal authority for this drastic proposition, the court rejects

---

[9] Energy Coal is referring to *Green v. Champion Insurance Company*, 577 So. 2d 249 (La. App. 1 Cir. 1991), which was the first case to recognize and apply the SBE doctrine in Louisiana.

Energy Coal's argument that CITGO, simply by continuing to do business in Louisiana after 1991, could expect to be sued for the actions of its Venezuelan affiliates. To hold otherwise would encourage rampant forum shopping. The court will not turn Louisiana into a forum for resolving international disputes that have absolutely no connection to this state.

Likewise, Energy Coal certainly could not have had a justified expectation that disputes regarding its contracts with Petroleo would be resolved in the Louisiana courts pursuant to Louisiana law. As stated previously, each of the contracts at issue contained a clause designating Venezuela as both the ultimate forum for resolving disputes and the source of governing law.[10] Energy Coal cannot now argue that, when it entered into the contracts with Petroleo, it expected to be able to ignore those provisions and sue in Louisiana based on the fact that Petroleo's corporate affiliate operates a refinery here. To hold that such an expectation was reasonable would invite foreign plaintiffs to sue in Louisiana courts over disputes arising anywhere in the world. The court declines to extend that invitation.

### 3. Delaware Law Would be the Most Seriously Impaired if its Law Were Not Applied

In sum, the court finds that Delaware's law would be the most seriously impaired if it were not applied to the issue of whether CITGO may be sued for damages caused by the alleged actions of Petroleo. Under these facts, Delaware's public policy of respecting the separate legal existence of corporations outweighs the policy behind Louisiana's SBE doctrine—*i.e.* providing an equitable remedy to an aggrieved party that would otherwise be unavailable as a result of business fragmentation. *See City of Alexandria v. Cleco Corp.*, Civil Action No. 1:05-cv-01121, 2010 WL 114397, at *7–*8 (W.D. La. Jan. 11, 2010). There is simply nothing to suggest that Louisiana has

---

[10] *See supra* note 6 and accompanying text.

-11-

any real connection to, or interest in, this particular dispute.

The court's conclusion is well-supported by the jurisprudence. In applying article 3515 to
questions of disregarding corporate separateness, several Louisiana state and federal courts have
concluded that the law of the defendant's state of incorporation should apply.[11] The court finds the
decision in *NorAm Drilling Co. v. E & PCO Int'l, LLC*, 48-591 (La. App. 2 Cir. 2013); 131 So. 3d
926, to be particularly instructive. In that case, NorAm Drilling Company ("NorAm"), a Texas
corporation, was hired by E & PCo International, LLC ("EPI"), a Texas LLC, to drill a methane well
in Caldwell Parish, Louisiana. *NorAm*, 131 So. 3d at 927. NorAm claimed that the drilling contract
was breached, and therefore sued EPI in Louisiana state court. *Id.* NorAm also sued E & PCo, LLC
("EPL"), a separate Texas LLC that was not a party to the drilling contract. *Id.* NorAm claimed that
EPI and EPL constituted an SBE under Louisiana law, thereby rendering each company solidarily
liable for the other's debts. *Id.* The Louisiana Second Circuit Court of Appeal held that Texas law
applied to the dispute, and upheld the district court's dismissal of the case on the basis that Texas
does not recognize the SBE doctrine. The court found that Texas law applied for two alternate

---

[11] *See, e.g., Patin v. Thoroughbred Power Boats, Inc.*, 294 F.3d 640, 647 (5th Cir. 2002) ("[T]he
Louisiana Supreme Court would most likely conclude that the law of the state of incorporation governs the
determination of when to pierce a corporate veil."); *Global Oil Tools, Inc. v. Barnhill*, Civil Action Nos.
12:1507, 12-3041, 2013 WL 3070838, at *11–*12 (E.D. La. June 17, 2013) (deciding that Texas law applied
to an "alter ego" claim against a Texas corporation, because "Texas, like any state, has an interest in the
treatment of its corporations."); *San Francisco Estates, S.A. v. Westfeldt Brothers, Inc.*, No. Civ.A. 97-1102,
1998 WL 12243, at *4 (E.D. La. Jan. 13, 1998) ("Although Louisiana has an interest in insuring that its
citizens are not harmed by abuse of the corporate form, Missouri clearly has a greater interest in the veil
piercing question since the issue will determine the status of one of its corporate citizens."); *Powerup of S.E.
La., Inc. v. Powerup U.S.A., Inc.*, No. 94-1441, 1994 WL 543631, at *3 (E.D. La. Oct. 5, 1994) (citations
omitted) ("[Louisiana] cases suggest that the law of the state of incorporation should be applied to determine
fundamental issues of corporate existence of structure."); *In re Gulf Fleet Holdings, Inc.*, 491 B.R. 747, 788
(Bankr. W.D. La. Apr. 2, 2013) ("Applying Louisiana's choice-of-law rule for veil-piercing claims, the court
will look to the law of the state of incorporation."); *NorAm Drilling Co. v. E & PCO Int'l, LLC*, 48-591, p.
8 (La. App. 2 Cir. 2013); 131 So. 3d 926, 930 ("Louisiana courts and courts applying Louisiana law apply
the law of the place of incorporation to determine fundamental issues of corporate structure.").

reasons. First, the court found that the drilling contract's choice-of-law provision mandated that Texas law govern the claims against EPI. *Id.* at 928–29. Second, the court found that, under Louisiana's conflict-of-laws rules, including article 3515, Texas law should also apply to NorAm's attempt to hold EPL solidarily liable under the SBE doctrine. *Id.* at 929–30. In discussing article 3515, the court agreed with the defendants' position that "Texas has a strong interest in litigation deciding the corporate structure of companies formed and existing under Texas law." *Id.* at 930. The court found that "this is especially true when a Texas company is attempting to hold two other Texas companies liable under a theory of liability that has been expressly rejected by the Texas Supreme Court." *Id.* (citing *SSP Partners v. Gladstrong Inv.*, 275 S.W.3d 444, 447 (Tex. 2008))."

This case presents a similar situation to *NorAm,* only the rationale for applying Louisiana law is even less compelling. As was the case in *NorAm*, Louisiana's SBE doctrine has been invoked by a non-Louisiana plaintiff against a non-Louisiana defendant, which was not a party to the contract sued upon. Furthermore, just as in *NorAm*, the defendant's state of incorporation has not adopted the SBE doctrine, and thus an attempt to use the SBE doctrine would circumvent that state's public policy. *See Case Fin., Alliance Data Sys., BASF Corp.,supra* p. 7. Moreover, unlike *NorAm*, in which Louisiana had *some* connection to the dispute because the object of the contract was to drill a well in Caldwell Parish, the contracts in this case are not connected in any way to Louisiana and were exclusively concerned with work in a foreign country. It is quite clear that Louisiana has no interest in this dispute. As such, the law of Delaware, CITGO's state of incorporation, must control.

## B. The Complaint Fails to State a Claim Under Rule 12(b)(6)

CITGO argues that Energy Coal fails to state a claim under Delaware law, and thus dismissal is appropriate under Rule 12(b)(6). A motion filed pursuant to Rule 12(b)(6) challenges the

-13-

sufficiency of a plaintiff's allegations. When ruling on a 12(b)(6) motion, the court accepts the plaintiff's factual allegations as true and views those facts in the light most favorable to the plaintiff. *Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003). To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 652, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). "A claim has facial plausibility when the plaintiff pleads the factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. . . . Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Although the court must accept as true all factual allegations set forth in the complaint, the same presumption does not extend to "conclusory allegations, unwarranted factual inferences, or legal conclusions." *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007) (quoting *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005)); *see also Iqbal*, 556 U.S. at 664 ("While legal conclusions can provide the complaint's framework, they must be supported by factual allegations.").

Energy Coal's breach-of-contract allegations pertain only to Petroleo's actions. [Doc. #1-2, pp. 7–41, ¶¶ 22–129]. Nowhere is CITGO alleged to have been a party to the disputed contracts, and nowhere is CITGO alleged to have taken any part in the performance thereof. Energy Coal's sole argument against CITGO is that all PDVSA subsidiaries are really one single entity, and therefore CITGO is solidarily liable for Petroleo's debt. *Id.*, ¶¶ 23, 55, 61, 67, 78, 86, 93, 109, 112, 114, 127. The court finds that, even accepting the factual allegations of Energy Coal's petition as true, such a claim is not plausible.

-14-

The overarching theme of Energy Coal's argument is that PDVSA and its subsidiaries "have integrated their resources to achieve a common business purpose and thus form a single business enterprise engaged in the exploration, production, refining, transportation, and sale of petroleum products throughout the world."[Doc. #1-2, p. 2, ¶ 6]. In support of this assertion, Energy Coal first points to certain information found in PDVSA's "Financial and Operational Information Report," dated December 31, 2007 ("the 2007 Report"). *Id.* at 2–3, ¶ 7. In particular, Energy Coal points out that the 2007 Report states that PDVSA "carries out its operations through its subsidiaries." *Id.* at 2, ¶ 7a. The 2007 Report also acknowledges that PDVSA is "a vertically integrated company" with "upstream" activities in Venezuela and "downstream" activities in foreign markets. *Id.* at 3,¶ 7f. As reflected in the 2007 Report, some "upstream" activities are carried out by Petroleo in Venezuela." *Id.,* ¶ 7c. The 2007 Report also reflects that PDVSA's "downstream" operations include CITGO's operations in North America. *Id.* ¶¶ 7b, 7d. Furthermore, according to the 2007 Report, PDVSA and CITGO have entered into long term requirements contracts, under which PDVSA supplies CITGO with specified minimums of crude oil and other raw materials for processing at CITGO's refineries. *Id.*, ¶ 7e. The 2007 Report further reflects that PDVSA's total sales, costs, and operating expenses were affected as a result of CITGO's operations. *Id.*, ¶¶ 7g, 7h, 7i.

Next, Energy Coal directs the court's attention to PDVSA's "2013 Consolidated Financial Statements" ("the 2013 Statements"). *Id.* at 4, ¶ 8. Energy Coal claims the 2013 statements "acknowledge and confirm that PDVSA controls CITGO" and the other subsidiaries included therein. *Id.* Energy Coal points out that the 2013 Statements reflect that many directors of PDVSA "maintain key positions in its subsidiaries and other related entities and can thereby influence those subsidiary's [*sic*] operations and financial policies." *Id.*, ¶ 8f. Finally, Energy Coal claims that

-15-

"CITGO's board of directors lacks independence from PDVSA and Petroleo and is set up to act in the best interests of PDVSA, even if doing so is not necessarily in CITGO's interest." *Id.* at 5, ¶ 10. Energy Coal then identifies several CITGO directors and officers who it claims are concurrently serving, or have previously served, as directors and officers of PDVSA or its various subsidiaries. *Id.* at 5–6, ¶¶ 11–18.

The above allegations, even when accepted as true, do not suggest that PDVSA and its subsidiaries may be treated as single entity under Delaware law. Delaware courts "will disregard the corporate form only in 'the exceptional case.'" *Case Fin., Inc. V. Alden*, Civil Action No. 1184-VCP, 2009 WL 2581873, at *4 (Del. Ch. Aug. 21, 2009) (quoting *Sprint Nextel Corp. v. iPCS, Inc.*, Civil Action No. 3746-VCP, 2008 WL 2737409, at * 11 (Del.Ch. July 14, 2008)). "To pierce the corporate veil, a plaintiff must show that the interests of justice require it because matters like fraud, public wrong, or contravention of law are involved." *BASF Corp. v. POSM II Properties P'ship, L.P.*, C.A. No. 3608–VCS, 2009 WL 522721, at *8 n. 50 (Del Ch. Dec. 9, 2008) (citing *Pauley Petroleum, Inc. v. Cont'l Oil Co.*, 239 A.2d 629, 623 (Del. 1968)). "[A] court may pierce the corporate veil of an entity only where there is fraud or where a subsidiary is in fact a mere instrumentality or alter ego of its owner." *Geyer v. Ingersoll Publ'ns Co.*, 621 A.2d 784, 793 (Del. Ch.1992) (citing *Mabon, Nugent & Co. V. Tex. Am. Energy Corp.*, Civ. A. No. 8578, 1990 WL 44267 (Del. Ch. Apr. 12, 1990). In deciding whether a subsidiary is an instrumentality or alter ego of a parent corporation, courts look to: (1) whether the subsidiary was adequately capitalized for the undertaking; (2) whether the subsidiary was solvent; (3) whether corporate formalities were observed; (4) whether the parent siphoned company funds; and (5) whether, in general, the subsidiary simply functioned as a facade for the parent. *MicroStrategy, Inc. v. Acacia Research Corp.*, Civil Action No. 5735-VCP, 2010 WL

-16-

5550455, at \*11 (Del. Ch. Dec. 30, 2010) (citation omitted). "A decision to disregard the corporate entity generally results not from a single factor, but rather some combination of them, and 'an overall element of injustice or unfairness must always be present, as well.'" *Id.* (quoting *EBG Holdings. LLC v. Vredezicht's Gravenhage 109 B.V.*, Civil Action No. 3184-VCP, 2008 WL 4057745, at \*12 (Del. Ch. Sept. 2, 2008).

Here, there is no plausible alter ego claim under Delaware law. There are no allegations that CITGO was inadequately capitalized, was insolvent, or failed to observe corporate formalities; nor is there any allegation that PDVSA "siphoned company funds" from CITGO. The facts alleged do not in any way suggest that CITGO lacks a separate legal identity from PDVSA or "functions as a facade" for PDVSA. Energy Coal's allegations merely establish that: (1) PDVSA carries out worldwide operations through numerous wholly-owned subsidiaries, including Petroleo in Venezuela and CITGO in the United States; and (2) that CITGO and PDVSA share several common officers and directors. These facts do not suggest that a fraud, public wrong, or contravention of law has been committed as a result of CITGO and PDVSA being formed separately. "The fact that one corporation is a wholly owned subsidiary of another and that there may be common officers or directors is insufficient to pierce the corporate veil." *La Chemise Lacoste v. Gen'l Mills, Inc.*, 53 F.R.D. 596, 603 (D. Del. 1971). Stated differently, "[m]ere control or even total ownership of one corporation by another is not sufficient to warrant the disregard of a separate corporate entity. Absent a showing of a fraud or that a subsidiary is in fact the mere alter ego of the parent, a common central management alone is not a proper basis for disregarding separate corporate existence." *Skouras v. Admiralty Enter., Inc.*, 386 A.2d 674, 681 (Del. Ch. 1978)(citations omitted). Energy Coal fails to allege anything other than a standard parent-subsidiary relationship between CITGO and PDVSA,

-17-

and thus the complaint must be dismissed.

This is not the first time that a plaintiff has attempted to sue CITGO for the actions of its

corporate affiliates. In *RSM Production Corporation v. Petroleos de Venezuela Societa Anonima*

*(PDVSA)*, the plaintiff, a Texas oil exploration company, claimed that PDVSA and Petroleo were

interfering with the exploration license granted to plaintiff by the nation of Grenada. 338 F. Supp.

2d 1208, 1211 (D. Colo. 2004). The plaintiff therefore brought suit against PDVSA and Petroleo on

various tortious-interference and  antitrust theories. *Id.* at 1212. The plaintiff also named CITGO as

a defendant, based solely on the fact that CITGO is a wholly-owned subsidiary of PDVSA. *Id.* at

1216. The court held that PDVSA and Petroleo were immune from suit under Foreign Sovereign

Immunities Act, 28 U.S.C. §§ 1602–1611, and therefore dismissed plaintiff's claims against those

defendants. The court also dismissed the claims against CITGO, finding as follows:

> CITGO argues that the claims against it must be dismissed because the plaintiff has
> not alleged any wrongdoing by CITGO. The complaint does not describe any actions
> allegedly undertaken by CITGO. The plaintiff's only allegation concerning CITGO
> is that CITGO is alleged to be the wholly owned U.S. marketing arm of PDVSA. In
> its response to CITGO's motion to dismiss, RSM argues that CITGO is part of
> PDVSA's integrated production, transportation, and distribution system. RSM claims
> CITGO's role as part of this network subjects it to liability under the Sherman Act for
> PDVSA's attempts to exert unfair market pressure on RSM. As to CITGO, however,
> the Complaint does not contain any allegations of fact that would, if true, subject
> CITGO to liability under the Sherman Act or on any other basis. The fact that CITGO
> is a wholly owned subsidiary of PDVSA, without more, does not subject CITGO to
> liability on any basis.

*Id.* (internal citation omitted).

The court finds that the *RSM* case lends further support to its decision to dismiss Energy

Coal's claims against CITGO. Here, as in *RSM*, CITGO has been sued for the actions of one its

Venezuelans affiliates, and not for any actions taken by CITGO itself. Furthermore, just as in *RSM,*

there is no plausible claim that CITGO and its Venezuelan affiliates should be treated as a single

entity, for the reasons previously explained. Accordingly, Energy Coal's complaint must be dismissed under rule 12(b)(6). Because the court finds that Energy Coal fails to state a claim under Rule 12(b)(6), the court need not discuss CITGO's alternative arguments regarding ripeness and failure to join a necessary and indispensable party. [Doc. #18-1, pp. 5–19].

### III. CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that CITGO's motion to dismiss, [Doc. #18], be and is hereby **GRANTED,** and that Energy Coal's suit be and is hereby **DISMISSED WITH PREJUDICE**.

THUS DONE AND SIGNED in Shreveport, Louisiana, this 26 day of August, 2015.

DONALD E. WALTER
UNITED STATES DISTRICT JUDGE